39 P.3d 984 (2002)
Herbert BARSTAD and Diane Barstad, husband and wife, together with their marital community; Scott Duda and Carlene Duda, husband and wife, together with their marital community; Clarence Heiser and Harriett Heiser, husband and wife, together with their marital community; Ingeborg Keicher, an individual; James Koetje and Margaret Koetje, husband and wife, together with their marital community; Thomas Lian and Mabel Lian, husband and wife, together with their marital community; Gary Mesick and Pamela Mesick, husband and wife, together with their marital community; Robin J. Olsen, an individual; Donald Phelps and Carol Phelps, husband and wife, together with their marital community; Dale Soden and Margaret Soden, husband and wife, together with their marital community; Robert Stull and Linda Stull, husband and wife, together with their marital community; and Arne Sunde and Violet Sunde, husband and wife, together with their marital community; on their own behalf and on behalf of similarly situated individuals and marital communities, Respondents,
v.
STEWART TITLE GUARANTY COMPANY, INC., a Texas insurance company; Pacific Northwest Title Company, Inc., a Washington insurance company; Stewart Title Company of Washington, Inc., a Washington insurance company; Thurston County Title Company, Inc., a Washington insurance company; Sentinel Properties, Inc., d/b/a Evergreen Services, a Washington corporation; The Estate of Dennis Johnson; Katherine Johnson, a single woman; Properties Four, Inc., a Washington corporation; and Thomas R. Hazelrigg III, a single man, Petitioners.
No. 70268-3.
Supreme Court of Washington, En Banc.
Argued October 23, 2001.
Decided February 14, 2002.
*985 Preston, Thorgrimson, Ellis & Holman, John Ankeny Gose, Richard Gibson Masters, amicus curiae on behalf of Wash. Land Title Ass'n.
Sandler, Ahern & McConaughy, Michael David Sandler, Seattle, for Petitioners.
Paul Edward Brain, Michael Jon Layton, Puyallup, Talmadge & Stockmeyer, Philip Albert Talmadge, Tukwila, Short, Cressman & Burgess, James Albert Oliver, Seattle, for Respondents.
BRIDGE, J.
Presented here is a class of insured individuals who claim that title insurance companies should have made certain disclosures to them in preliminary commitments for title insurance. Specifically, these insureds claim that the companies should have disclosed that the parcels of land securing the loans had not been divided from larger tracts, that a senior lien existed on two of the lots, and that loan proceeds were being used to satisfy the senior lien. The title insurance companies contend that they had no such disclosure obligations. We agree with the title companies and hold that title insurance companies have no general duty to disclose potential or known title defects in preliminary title commitments.

*986 FACTS
Properties Four, Inc., a real estate investment company, owned two undeveloped tracts of land in Washington, one in Maytown and the other in Lacey. The Maytown tract consisted of one contiguous 68-acre plot of land while the Lacey property was comprised of four 40-acre lots. To finance development of the lots, Properties Four arranged for Sentinel Properties, Inc., d/b/a Evergreen Services (Evergreen) to serve as a loan broker and to bundle investment loans. Evergreen or its predecessor, Consumer Loan Services of Lynnwood a/k/a Commercial Loan of Lynnwood (CLS), recruited loan participants through networks of friends and families and "free meal deals" where a potential investor would receive a free buffet dinner if he or she attended a loan presentation. Between August 1994 and January 1996 Evergreen facilitated loans from approximately 400 individuals.[1]
Evergreen and its principals would then package a series of loans with 8 to 20 participatory interests each. Investors were assigned a percentage of the loan, with an average loan ranging from $5,000 to $25,000. When Evergreen achieved $200,000 by combining the individual loans, it would make a new loan to Properties Four. Approximately 8 such loans were secured for the Maytown property ($1.6 million) and 23 for the Lacey property ($4.6 million) for a total of 31 loans.
Properties Four and its president, Thomas Hazelrigg, subsequently issued a promissory note to each loan participant. Properties Four also secured the loans by granting a deed of trust on a smaller parcel of land within each larger tract. The larger tracts had not been subdivided into smaller parcels when the loans were secured. When the investors' loans were secured, the Maytown property was unencumbered. However, lots 2 and 3 of the Lacey property already possessed liens on behalf of Pacific Coast Investment Company, a prior lender.
To insure the loans, a Properties Four broker, Larry Landin, requested title insurance commitments for the loans. Stewart Title Guaranty Company, Inc. (STG) ultimately issued 29 of the 31 insurance policies to the investors and Pacific Northwest Title Insurance Company, Inc. (PNTIC) issued the remaining two policies. Mike Gilbertson, STG's regional underwriter, arranged and supervised both the preliminary commitments for the insurance and the final insurance policies.
Because the real estate was situated in Thurston County, Gilbertson contacted STG's licensed agent in Thurston County, petitioner Thurston County Title Company, Inc. (TCT). TCT agreed to examine the title records and prepare a list of exceptions for inclusion in the preliminary commitment for the insurance policies and to prepare the commitment and the final title policy with the underwriter's approval. Because TCT did not agree to perform all of the typical agent functions, Gilbertson employed STG's Seattle agent, petitioner Pacific Northwest Title Insurance Co., f/k/a Stewart Title Company of Washington, Inc.[2] (PNW), to provide additional support.[3] TCT forwarded the completed preliminary commitments to PNW who then entered the information into their computer system, repackaged the commitments in STG jackets and distributed them to Evergreen.[4] PNW also collected the premiums for the title work and reimbursed TCT for its efforts.
PNW was aware that Pacific Coast's senior liens were supposed to be subordinated or discharged and had not been. Nevertheless, the preliminary commitments and title insurance policies listed these existing liens.[5] The insureds assert that Evergreen intended to use the loan proceeds to satisfy the senior debts to ensure that the investors would have *987 first priority. To accomplish this objective, the investors' loans were first used to fulfill Property Four's senior debt obligations on the two Lacey lots. STG planned to issue the policies at an unspecified future date when the eight loans on the Lacey lots were closed and the senior debt satisfied. The investors were unaware of this use of the loan proceeds.
In early 1996, Properties Four defaulted on the loans. The investors accepted a deed in lieu of foreclosure on the Maytown property and they successfully foreclosed on lot 1 of the Lacey property, resulting in $1.358 million in proceeds. These proceeds did not cover the entire amount of the loans, however, and Pacific Coast still possessed senior liens on Lacey lots 2 and 3. The liens on the Lacey lots were assigned to a third party who foreclosed ahead of the investors. The investors who were successful in foreclosing and selling collateral sued for the difference between the amount of their loans and the amount recovered from selling the property.

PROCEDURAL HISTORY
In December 1997, the investors filed a class action lawsuit claiming negligent or intentional misrepresentation, violation of Washington securities law, chapter 21.20 RCW, and declaratory relief for coverage under the title insurance policy. The plaintiffs later added claims for violation of Washington's racketeering statute, chapter 9A.82 RCW, violation of federal racketeering law, 18 U.S.C. § 1962, breach of fiduciary duty, violation of the Consumer Protection Act (CPA), chapter 19.86 RCW, and conspiracy. The original complaint named as defendants Properties Four and its owner, Thomas Hazelrigg, Evergreen and its owners, Dennis and Katherine Johnson, STG, and selected real estate appraisers. The plaintiffs later added PNTIC, PNW and TCT. The plaintiffs settled with STG and either settled, dismissed or decided not to proceed against all other parties except PNW and TCT.
Both sides filed motions for summary judgment. The trial court granted the title companies' motion to dismiss the insureds' claims for breach of fiduciary duty, violation of securities law, violation of Washington's racketeering statute and violation of the federal racketeering statute. The court partially dismissed the misrepresentation claims and the parties later stipulated to their complete dismissal. The trial court denied the title companies' motion to dismiss the CPA and civil conspiracy claims, stating:
[I]t is expressly determined that even though there is no Washington case which has imposed a duty upon title insurers to disclose, the Court is of the view that the Washington Supreme Court would impose a duty on title insurers in the context of issuing preliminary commitments to disclose material defects in title of record and known defects not of record, including a duty upon these Defendants to disclose in preliminary commitments (a) the risks relating to lack of platting and subdivision of the collateral given in connection with the Lacey and Maytown loans; (b) the alleged division of loan proceeds in connection with the Lacey lots 2 and 3 loans; and (c) the potential lien priority conflict among the Plaintiff Lenders on the Lacey lots 2 and 3 loans.[[6]]
The trial court stayed the trial date pending appellate review of the summary judgment order. The parties stipulated and the trial court ordered that "[i]f the appellate court finds that the duty to disclose imposed by the trial court does not exist, Plaintiffs will be unable to prove all necessary elements of their negligent misrepresentation, CPA violation and conspiracy claims."[7] The petitioners then filed a motion for discretionary review to determine whether this court would impose such a duty.

ANALYSIS
On four separate occasions this court has been asked to decide whether title insurance companies possess a general duty to search and disclose potential title defects when issuing preliminary commitments for title insurance and four times we have declined to directly decide this issue, basing our *988 opinions on other grounds. See Shotwell v. Transamerica Title Ins. Co., 91 Wash.2d 161, 588 P.2d 208 (1978) (holding exclusionary language in insurance policy should be interpreted in manner most favorable for insured and as would be understood by average person purchasing insurance); Transamerica Title Ins. Co. v. Johnson, 103 Wash.2d 409, 693 P.2d 697 (1985) (holding only insured may bring action for CPA violation); Klickman v. Title Guar. Co. of Lewis County, 105 Wash.2d 526, 716 P.2d 840 (1986) (holding lien on proceeds from sale of property does not affect title and is not encumbrance); Lombardo v. Pierson, 121 Wash.2d 577, 852 P.2d 308 (1993) (holding document disclosing continuing obligation to pay irrigation assessments was not expressly excepted from title insurance policy and title insurance company did not have duty to disclose such information). We now address the question directly and respond in the negative.

RCW 48.29.010
Subsequent to the decisions in the four previous cases, the Legislature amended the definition section of chapter 48.29 RCW, which sets forth the general duties of title insurers, clarifying the distinctions between a title policy, an abstract of title, and a preliminary report, binder or commitment.[8] In distinguishing between a preliminary commitment and an abstract of title, the Legislature also clarified some of the responsibilities associated with each form. The insureds ask this court to decide that a preliminary commitment serves essentially the same purpose as an abstract of title. Such a conclusion would be contrary to the clear language of RCW 48.29.010.
As defined, a preliminary commitment is a statement submitted to the potential insured establishing the terms and conditions upon which the title insurer is willing to issue a title policy. See RCW 48.29.010(3)(c). The statement is merely an offer to issue the title insurance subject to the stated conditions. Id. Significantly, the Legislature clearly established that a preliminary commitment is not a representation of the condition of title, but a "statement of terms and conditions upon which the issuer is willing to issue its title policy, if such offer is accepted." RCW 48.29.010(3)(c). Furthermore the statute explicitly states that "reports are not abstracts of title, nor are any of the rights, duties, or responsibilities applicable to the preparation and issuance of an abstract of title applicable to the issuance of any report." Id.
An abstract of title, on the other hand, is a "written representation, provided pursuant to contract ... intended to be relied upon by the person who has contracted for the receipt of such representation." RCW 48.29.010(3)(b). Unlike a preliminary commitment, an abstract of title lists all recorded conveyances, instruments, or documents that impact the chain of title. Id. The definition further establishes that the abstract of title imparts "constructive notice with respect to the chain of title to the real property described." Id. The preliminary commitment does not serve this same purpose.
The amended statute thus resolves the obligations associated with a preliminary commitment and an abstract of title. However, *989 the statute was amended at least one year after the insurance agents here issued their preliminary commitments, though several months before the class filed this action.

Retroactive Application
A statutory amendment will be applied retroactively, if constitutionally permissible under the circumstances, when it is (1) intended by the Legislature to apply retroactively, (2) curative in that it clarifies or technically corrects ambiguous statutory language, or (3) remedial in nature. McGee Guest Home, Inc. v. Dep't of Soc. & Health Servs., 142 Wash.2d 316, 324-325, 12 P.3d 144 (2000) (citing State v. Cruz, 139 Wash.2d 186, 191, 985 P.2d 384 (1999)). The court may turn to the statute's purpose and language,[9] legislative history,[10] and legislative bill reports to analyze retroactivity.[11] An amendment is curative and remedial if it clarifies or technically corrects an ambiguous statute without changing prior case law constructions of the statute. In re Pers. Restraint of Matteson, 142 Wash.2d 298, 308, 12 P.3d 585 (2000). Thus "`[s]ubsequent enactments that only clarify an earlier statute can be applied retrospectively.'" Id. at 307, 12 P.3d 585 (quoting State v. Dunaway, 109 Wash.2d 207, 216 n. 6, 743 P.2d 1237, 749 P.2d 160 (1987) (citing Johnson v. Morris, 87 Wash.2d 922, 925, 557 P.2d 1299 (1976); Marine Power & Equip. Co. v. Human Rights Comm'n Hearing Tribunal, 39 Wash.App. 609, 614, 694 P.2d 697 (1985))). This court generally disfavors retroactive application of a statute.[12]
The Legislature's amendment to RCW 48.29.010 represents a statutory clarification analogous to those retroactively applied in McGee and Matteson. As the legislative history for RCW 48.29.010 indicates, the amendment was intended to clarify the differences between an abstract of title, a title policy, and a preliminary title report, commitment, or binder. See Final B. Rep. (HB 1452), 55th Leg., Reg. Sess. 1 (Wash. July 27, 1997)
("The differences between an abstract of title, a title policy, and a preliminary title report, commitment, or binder are clarified."). Uncontroverted testimony in the Senate and the House lends additional support to this stated intent. See S.B. Rep. (HB 1452), 55th Leg., Reg. Sess. 2 (Wash. July 27, 1997) ("Abstracts are harder to create and to read, and abstracts do not provide insurance. In designing and purchasing title insurance products, consumers must know they are purchasing title insurance and not an abstract of title."); H.B. Rep. (HB 1452), 55th Leg., Reg. Sess. 2 (Wash. July 27, 1997) ("This bill clarifies differences between an abstract of title and title insurance.").
The McGee court recognized that "[w]e often apply amendments retroactively `where an amendment is enacted during a controversy regarding the meaning of the law.'" McGee, 142 Wash.2d at 325, 12 P.3d 144 (quoting Tomlinson v. Clarke, 118 Wash.2d 498, 511, 825 P.2d 706 (1992)). Additionally, "[t]he Legislature's intent to clarify a statute is manifested by its adoption of the amendment `"soon after controversies arose as to the interpretation of the original act[.]"'" McGee, 142 Wash.2d at 325, 12 P.3d 144 (quoting Johnson v. Cont'l W., Inc., 99 Wash.2d 555, 559, 663 P.2d 482 (1983) (quoting 1A C. DALLAS SANDS, STATUTORY CONSTRUCTION § 22.31 (4th ed.1972))). Testimony in the Senate supports such an intention as to RCW 48.29.010. S.B. Rep. (HB 1452) at 2 ("[t]he lack of clear definitions in this statute has caused some litigation, and we want to avoid this litigation"). The Senate's recognition of past litigation and the likelihood of future litigation, resulting from confusion about the distinctions between an abstract of title and a preliminary commitment, support a conclusion that retroactive application is appropriate.
The insureds cite State v. T.K., 139 Wash.2d 320, 987 P.2d 63 (1999), to support prospective application of RCW 48.29.010. Combining T.K. with McGee, they contend *990 that a court should not apply an amendment retroactively when it impacts substantive rights. While T.K. and McGee generally support this proposition, the amendments to RCW 48.29.010 do not appear to be substantive changes in the law. An examination of T.K. helps illustrate this point.
T.K. involved an amalgamation of three representative cases where the defendants had sought to seal their respective juvenile records. T.K., 139 Wash.2d at 323-25, 987 P.2d 63. Prior to its amendment, the relevant statute permitted juvenile offenders to petition the court to vacate disposition orders and to permanently seal juvenile court files two years after discharge from state agency supervision. Id. All three of the defendants in T.K. had met this two-year period preceding the statute's amendment. Id. In 1997, the Legislature amended RCW 13.50.050 requiring sealing only after the petitioner had spent 10 consecutive years in the community without committing additional offenses for a Class B felony and after 5 years for a Class C felony. Id. The amendment thus substantively changed the law from a 2-year waiting period, to either 5 or 10 years, depending on the level of the crime.[13]
In contrast, the amendment to the title insurance statute does not substantively change the law.[14] Rather, it appears to simply confirm industry practice as well as to clarify legislative intent. For example, the Washington Real Property Deskbook from 1996 states with regard to title insurance that the commitment is not a report on the status of title to the property. 3 WASH. STATE BAR ASS'N, WASHINGTON REAL PROPERTY DESKBOOK § 39.10, at 39-14 (3d ed.1996). "Rather it provides assurance that upon closing, a policy or policies will be issued subject only to those exceptions agreed upon or as permitted by the proposed insured." Id. The Washington Practice has also noted that:
Title insurers roundly deny they have the abstracter's duty. They argue that the preliminary commitment merely discloses what the policy will and will not cover, that their only legal obligation is to pay for losses under the policy, and that an insured has no reasonable expectation of anything more.
18 WILLIAM B. STOEBUCK, WASHINGTON PRACTICE: REAL ESTATE TRANSACTIONS § 13.18, at 147 (1995). Furthermore, the Washington Land Title Association (WLTA)[15] asserts that a ruling finding a disclosure duty "would disrupt the manner in which the title industry has done business for decades with respect to subdivision and other comparable issues."[16]
The elements of a preliminary commitment also illustrate that it was not common industry practice to disclose the same title information generally included in an abstract of title. According to the Deskbook, a preliminary commitment will likely include (1) the type of policy or policies to be issued, (2) the amount of the proposed policy or policies to be issued, (3) the nature of the title (fee, leasehold, etc.), (4) the current owner of the title, (5) the legal description of the land, (6) the title defects that the title company would not be willing to eliminate if the policy were then being written, and (7) requirements, if any, of the title company. DESKBOOK, supra, § 39.10, at 39-15. The only element that appears applicable is item six; however, exclusionary clauses merely represent aspects of the property that the insurance company will not cover if it issues a title insurance policy. Id. at 39-20. The *991 exceptions or exclusions are not intended to indicate known encumbrances or defects of title.[17] Considering the common elements of the commitment and the purpose of the exclusions, it logically follows that the preliminary commitment is not intended to disclose recorded or unrecorded defects of title.
As industry practice suggests, title insurance companies conduct the necessary research to determine the scope of the policy that they will offer to the potential insured. DESKBOOK, supra, § 39.8, at 39-12 ("This search is for the benefit of the title insurer, not the insured."). Furthermore, this court has recognized that to require the title insurance companies to disclose this information may constitute a significant change in the law. Johnson, 103 Wash.2d at 413, 693 P.2d 697. Therefore, industry practice further supports the proposition that because a duty did not exist, such a clarification would not substantively change the law and retroactive application of RCW 48.29.010 is appropriate in this case.

Other Ninth Circuit States
In applying RCW 48.29.010 retroactively, we side with the narrow majority of state courts in the Ninth Circuit that have held that title insurance companies have no general disclosure duty in preliminary commitments. Among Ninth Circuit states, California,[18] Oregon,[19] Idaho[20] and Nevada,[21] have all held that there is no general duty to disclose title defects in preliminary commitments. See generally 3 BAXTER DUNAWAY, THE LAW OF DISTRESSED REAL ESTATE: FORECLOSURE, WORKOUTS, PROCEDURES App. 27B D (2001); and Jay M. Zitter, Title Insurer's Negligent Failure to Discover and Disclose Defect as Basis for Liability in Tort, 19 A.L.R.5th 786 (1994 & Supp.2000). Of these states California is notable because it enacted a statute similar to RCW 48.29.010 clarifying the duties associated with preliminary commitments. See CAL. INS.CODE § 12340.10-11 (West 1988). The California statute clarified the duties associated with an abstractor as contrasted with a title insurer who issues a preliminary report. See Herbert A. Crocker & Co. v. Transamerica Title Ins. Co., 27 Cal.App.4th 1722, 33 Cal.Rptr.2d 313, review denied (Oct. 26, 1994). Many states outside the Ninth Circuit have also held that an insurance company does not have a general duty to disclose. See generally DUNAWAY, supra, App. 27B-D; Zitter, supra, 19 A.L.R.5th 786.

Fiduciary Duty
Independent from the applicability of RCW 48.29.010 and other state courts' decisions, the insureds argue that the imposition of a general disclosure duty for preliminary commitments is supported by two cases from the liability insurance context, Tank v. State Farm Fire & Cas. Co., 105 Wash.2d 381, 715 P.2d 1133 (1986); Van Noy v. State Farm Mut. Auto. Ins. Co., 142 Wash.2d 784, 16 P.3d 574 (2001). Both Tank and Van Noy are distinguishable and we decline to extend their general principles to the case presented.
Tank involved the duty to defend an insured when the insurance company accepts defense under a reservation of rights. Favorably citing other "defense" cases, the Tank court noted that "an insurer owes the *992 same duty of good faith to its insured, regardless of the type of defense it has undertaken." Tank, 105 Wash.2d at 387, 715 P.2d 1133. In Tank we reasoned that the potential conflict of interest in this type of defense mandates a higher standard of care. Id. Additionally, we stated "an insurance company's duty of good faith rises to an even higher level than that of honesty and lawfulness of purpose toward its policyholders: an insurer must deal fairly with an insured, giving equal consideration in all matters to the insured's interests." Id. at 386, 715 P.2d 1133. In Tank we addressed a specialized area in the insurance industry, defense under a reservation of rights. We determined that because of the potential conflict of interest in this particular area, it warranted a heightened good faith obligation. Id. at 387, 715 P.2d 1133. Because this case does not present such an inherent conflict of interest, Tank is distinguishable and we refrain from extending its general principles.
Van Noy involved an insurance company's retroactive denial of personal injury protection coverage more than a month after receiving notice of the insureds' claims and after the insureds had already begun treatment for their injuries. Van Noy, 142 Wash.2d at 785, 16 P.3d 574. We held that the insurers had a quasi-fiduciary duty to deal fairly with the insureds and to give equal consideration to their interests in all matters. Id. at 793, 16 P.3d 574. We determined that even though the appellate court's decision referred to the duty as an "enhanced fiduciary obligation," the use of that terminology was not intended to impose a novel fiduciary duty on the insurer. Id. at 794, 16 P.3d 574. Thus, we did not impose a new duty in Van Noy and the relationship between an insured and insurer in the context of a preliminary commitment for title insurance does not warrant applying an enhanced fiduciary duty now.
The insureds also rely on RCW 48.01.030[22] as a conduit to impose an enhanced fiduciary duty in these circumstances. RCW 48.01.030 holds persons in the insurance industry to a good faith standard and has been frequently applied when an insurer denies claim coverage or acts unreasonably when processing a claim. See generally Gingrich v. Unigard Sec. Ins. Co., 57 Wash.App. 424, 788 P.2d 1096 (1990); Safeco Ins. Co. of Am. v. JMG Rest., Inc., 37 Wash.App. 1, 680 P.2d 409 (1984). We have interpreted "bad faith," potentially in violation of RCW 48.01.030, as an act that is unreasonable, frivolous or unfounded. Kirk v. Mt. Airy Ins. Co., 134 Wash.2d 558, 560, 951 P.2d 1124 (1998). In this case, the title insurance companies had reason to believe that Evergreen, acting as the investors registered agent, would disclose the information they provided to Evergreen to the investors. Additionally, industry practice supported the title insurance companies' belief that the information would be disclosed elsewhere, such as in an abstract of title. Because the title insurance companies had a well-founded, reasonable basis for not including this information in their preliminary commitments, therefore, we cannot find that RCW 48.01.030 has been violated.

CONCLUSION
Viewing RCW 48.29.010 as curative and intended by the Legislature to apply retroactively, we now apply it retroactively and refuse to impose a general disclosure duty in preliminary commitments on title insurance companies. Accordingly we reverse the trial court's partial denial of summary judgment. The insureds' request for attorney fees pursuant to RCW 19.86.090 and RAP 18.1 is denied.
ALEXANDER, C.J., SMITH, JOHNSON, MADSEN, SANDERS, CHAMBERS, and OWENS, JJ., concur.
NOTES
[1] Evergreen was the registered agent for the investors, with power of attorney to act on their behalf.
[2] PNW is not to be confused with Stewart Title Guaranty Company (STG) who issued the title insurance.
[3] Gilbertson shared an office with PNW.
[4] The respondent's brief described the preliminary commitments as generally being issued to Landin Financial.
[5] Evergreen allegedly did not inform the insured of Pacific Coast's senior liens.
[6] Clerk's Papers (CP) at 2861.
[7] CP at 2837.
[8] RCW 48.29.010(3) states:

(a) "Title policy" means any written instrument, contract, or guarantee by means of which title insurance liability is assumed.
(b) "Abstract of title" means a written representation, provided pursuant to contract, whether written or oral, intended to be relied upon by the person who has contracted for the receipt of such representation, listing all recorded conveyances, instruments, or documents which, under the laws of the state of Washington, impart constructive notice with respect to the chain of title to the real property described. An abstract of title is not a title policy as defined in this subsection.
(c) "Preliminary report," "commitment," or "binder" means reports furnished in connection with an application for title insurance and are offers to issue a title policy subject to the stated exceptions set forth in the reports, the conditions and stipulations of the report and the issued policy, and such other matters as may be incorporated by reference. The reports are not abstracts of title, nor are any of the rights, duties, or responsibilities applicable to the preparation and issuance of an abstract of title applicable to the issuance of any report. Any such report shall not be construed as, nor constitute, a representation as to the condition of the title to real property, but shall constitute a statement of terms and conditions upon which the issuer is willing to issue its title policy, if such offer is accepted.
[9] Howell v. Spokane & Inland Empire Blood Bank, 114 Wash.2d 42, 47, 785 P.2d 815 (1990).
[10] In re F.D. Processing, Inc., 119 Wash.2d 452, 460, 832 P.2d 1303 (1992).
[11] Young v. Estate of Snell, 134 Wash.2d 267, 280, 948 P.2d 1291 (1997).
[12] See In re Estate of Burns, 131 Wash.2d 104, 110, 928 P.2d 1094 (1997).
[13] Similarly in State v. Smith, 144 Wash.2d 665, 30 P.3d 1245 (2001) we refused to retroactively apply an amendment to the Sentencing Reform Act of 1981, chapter 9.94A RCW, that would have revived prior washed out juvenile adjudications when calculating an offender score.
[14] While we have not previously held that title insurance companies have a duty to disclose title information in preliminary commitments, we have long recognized the potential disclosure duty associated with an abstract of title. See Anderson v. Spriestersbach, 69 Wash. 393, 394, 125 P. 166 (1912) (where abstractor knew that person to whom he delivers abstract at owner's expense will rely upon it in making trade or purchase, he is liable in damages for any loss resulting from material error or omission).
[15] All Washington title insurers are members of WLTA and thus can be viewed as representing industry practice. 18 STOEBUCK, supra, § 13.17, at 144.
[16] Br. of Amicus Curiae Washington Land Title Association at 12.
[17] DESKBOOK, supra, § 39.8, at 39-13.
[18] See Lawrence v. Chi. Title Ins. Co., 192 Cal. App.3d 70, 76, 237 Cal.Rptr. 264 (1987) (holding typical title insurance policy is not abstract of title and does not guarantee title is as set forth therein. Rather, title insurance policy only indemnifies insured for any losses resulting from cloud on insured's title as contained in policy provisions).
[19] Womer v. Melody Woods Homes Corp., 165 Or.App. 554, 997 P.2d 873, 875-76 (2000) (holding contractor could not rely on title report which included express disclaimer stating that it was preliminary only and not to be relied on).
[20] Anderson v. Title Ins. Co., 103 Idaho 875, 655 P.2d 82, 86 (1982) (holding title insurer, which was not impliedly acting as abstractor, could not be held liable in tort for failure to discover conveyance of portion of insureds' land to state). The respondents assert that the title agents knew about the "defects."
[21] Pioneer Title Ins. & Trust Co. v. Cantrell, 71 Nev. 243, 286 P.2d 261, 263-64 (1955) (holding exception in title policy was paraphrase to identity defect; it was not intended to constitute representation, binding expression or opinion as to legal nature or extent of that defect).
[22] RCW 48.01.030 states:

The business of insurance is one affected by the public interest, requiring that all persons be actuated by good faith, abstain from deception, and practice honesty and equity in all insurance matters. Upon the insurer, the insured, their providers, and their representatives rests the duty of preserving inviolate the integrity of insurance.